[Sac. No. 5050. In Bank.—February 26, 1937.]

In the Matter of the Guardianship of the Person and Estate of NONIE CORNAZ, an Incompetent Person.

In the Matter of the Guardianship of the Person and Estate of FRANK CORNAZ, an Incompetent Person.

In the Matter of the Estate of GEORGE CORNAZ, Deceased.

FRED E. HAYNES, Appellant, v. L. B. KOEHLER, as Administrator, etc., et al., Respondents.

Carter & Barrett and Daniel S. Carlton for Appellant.

John A. Spann and L. C. Smith for Respondents.

SEAWELL, J.—The questions presented in these several appeals, being common to all the cases herein, were consolidated for the purposes of trial and appeal and are submitted upon one record.

The members of the Cornaz household involved in this appeal consisted of three brothers and two sisters, to wit, George, Frank, Lewis, Nonie and Mrs. Julia Hivley. George, Lewis, Frank and Nonie had, prior to the death of George in 1934, acquired and owned in a manner hereinafter described a stock ranch consisting of several hundred acres of land, situate in a mountainous area near the town of Burney, county of Shasta, where they lived as a family and contributed their joint efforts to cattle raising. All grew into old age on the stock range except the married sister, Mrs. Julia Hivley, who seems to have withdrawn from the others in early life and made her home in the city of Sacramento. At the time of George's death, 1934, Mrs. Hivley, the eldest of the family, was seventy-five years of age, and Nonie, the youngest, was fifty-five years of age. The three brothers and sister, Nonie, were mountain people of simple and frugal habits. None of the four had ever married. They spent their years in a primitive, community-like fashion. George was the dominant member and business head of the family group. Mrs. Hivley was estranged from the three brothers and sister for some fifteen years prior to George's death. So far as the record discloses, she added nothing to the estate in which she hopes to share as an heir. In 1924, Lewis Cornaz, having completely lost his eyesight and being thus rendered helpless and unable to perform further services, deeded in September of that year his undivided thirteen-fortieths interest in and to the real property which primarily forms the basis of the controversy herein to his brothers, George and Frank, and his sister, Nonie. By bill of sale he also conveyed title to forty head of stock cattle owned by him to George, all of which was done in consideration of the promises made by said two brothers and sister that they would care for, support and maintain him during the remaining years of his life. He was then approximately fifty-eight years of age and resided on the ranch with said brothers and sister thereafter until the death of George, which occurred at the town of Burney, February 14, 1934. George died intestate. Letters of administration of his undivided interest in the lands and estate above referred to were issued to L. B. Koehler, who was the husband of Celia Cornaz Koehler, a deceased sister of said brothers and sister. A son, Roderick, is the only issue of the marriage of said

Koehler and Celia Cornaz Koehler, deceased, who in 1934 was approximately twenty years of age.

Within four months after the death of George, both Frank and Nonie were adjudged to be insane persons and each was committed by the Superior Court of the County of Shasta to the Napa State Hospital for the Insane. L. B. Koehler, brother-in-law of said insane persons, was by orders of said superior court appointed guardian of the person and estate of each. As to Frank, letters were issued May 21, 1934, and as to Nonie letters were issued June 18, 1934.

Lewis continued to live at the ranch home until shortly after the death of George and the commitment of said brother Frank and sister Nonie to the state hospital. There being no one left of the original household able to care for him, he was taken by his brother-in-law, L. B. Koehler, into his home, where he has since resided. His entire estate consisted of a Liberty Bond in the sum of $500. Each of said brothers owned a $500 Liberty Bond which they had purchased many years past. The two brothers and sister who had taken over his entire estate, real and personal, which was of the estimated value of from $10,000 to $12,000, in consideration of their agreements to furnish him shelter and the necessities of life so long as he should live, having been rendered simultaneously unable to perform their contracts by the intervention of death in the one case and the dual visitations of insanity in the other case, said brother-in-law, by reason of his knowledge of the aforesaid agreements and promises and the affairs of the family into which he had married, undertook to do what Lewis' two brothers and sister had agreed to do but were rendered unable by said misfortunes to comply with the covenants of their agreements.

The appellant in these appeals is Fred E. Haynes, a stranger to the blood; as the nominee of Mrs. Julia Hivley, a sister of decedent George, Lewis and the two incompetents.

Lewis filed claims against the administrator of George's estate, and also against the estates of the two incompetents, to enforce payment for his support and maintenance at the rate of $60 per month during the remainder of his life which, computed according to the mortality tables, gave him a life expectancy of approximately nine and one-half years. The total amount which will have been paid at the end of said life expectancy amounts to the sum of $7,190. This

sum, apportioned in equal parts to the three estates, amounts to approximately $2,400 from each. Within the time allowed by law a creditor's claim was presented by Lewis to L. B. Koehler as the administrator of the estate of George Cornaz, deceased, and also as the guardian of the estate of said incompetents, respectively. Lewis was at said time of the age of sixty-eight years. The claims, as filed, in each instance described the real property and the water rights, ditches and water privileges appurtenant to the lands which Lewis deeded to said brothers and sister, together with forty head of cattle by bill of sale executed September 10, 1924. The consideration set out in said creditor's claims is that the said Lewis Cornaz had, on said September 10, 1924, become blind and was unable to care for his personal needs and said brothers and sister agreed and warranted to him that if he would execute a deed of said lands to them and convey certain personal property which he then owned that they would, as a consideration therefor, provide him with the common necessities of life, including food, clothing, shelter and medical attendance during the remainder of his life and would pay his necessary burial expenses; that said Lewis Cornaz performed all of the covenants of said agreement on his part to be performed and said brothers and sister performed all on their part to the day of George's death, February 14, 1934, but since said day nothing has been contributed by said brothers or sister or from the estates of either or any of them for the support or maintenance of said Lewis. Lewis avers that $60 per month is a necessary and reasonable sum for support and maintenance during the remaining months of his life.

Through his attorney, L. C. Smith, Esq., Lewis gave written notice under date of November 24, 1934, to the heirs and to all persons interested in the estates of said decedent and incompetent persons, in which notice he recited the circumstance of his blindness; the making of said agreements; the conveyance of his property to said brothers and sister; the consideration therefor; the death of George and the incompetency of Frank and Nonie; the failure of compliance with said agreements by reason of the death and incompetency of the other parties thereto; his necessities as to care and maintenance and medical attention and hospitalization when sick, and prayed that the sum of $20 per month be assessed and made a charge against each one of said separate estates (aggre-

gating $60 per month), dating from George's death and continuing to the close of his life. The value of all of said property at the time it was conveyed is alleged to have been between $10,000 and $12,000. Said notice of claim states that the claims had been allowed by the administrator and the guardian of said respective estates and would be presented to the Honorable Albert F. Ross, Judge of the Superior Court of the County of Shasta, at his chambers at the hour of 10 o'clock, December 6, 1934, for approval, at which time all objections against the approval of said claims might be made and considered.

Julius Cornaz, a resident of the state of Oregon and a brother who hitherto had not figured in the family controversy, filed written objections to said claims of Lewis and also to certain items of the accounts. His objections were placed on the grounds that there was no authority in law to present a claim of the kind presented to the guardian of the incompetent persons; that it was barred by the statute of frauds, section 1973, subdivisions 4 and 6 of the Code of Civil Procedure, and by subdivision 1 of section 339, same code; that the claims were based upon a purported contract with the incompetents known as a personal contract which does not survive the death or the incompetency of the original party who entered into it.

Fred E. Haynes, as the nominee of Mrs. Hivley, filed petitions asking for the revocation of letters of adminstration and guardianship of whatsoever kind theretofore issued to L. B. Koehler in said matter and prayed that he be appointed in his stead. He set forth charges of waste and mismanagement on the part of L. B. Koehler and alleged that he represented interests adverse to and inimical to the interests of his wards and their estates. He charged that L. B. Koehler corruptly caused and procured the claims of Lewis to be prepared by his attorney at a time when said Lewis was in his care, custody and control and was then and there physically and mentally incompetent and incapable of transacting business, thereby violating their trust as guardian and attorney in the premises. A further ground of removal was based on the allegation that L. B. Koehler was never authorized by any competent person who was a relative or heir of said wards or decedent.

In due time, pursuant to notice, the hearing of the objections made to Lewis' claims on said matters came before the Honorable Albert F. Ross, Judge, and after presentation and consideration of the same said objections were disallowed and said claims were approved. The objections to the allowance of Lewis' claims, as well as all other objections made by appellant to the allowance of other claims and items of the accounts came before the Honorable H. S. Gans, Judge Presiding, and upon hearing he disallowed said objections and sustained the order allowing said claims as set forth in the accounts.

The motions to revoke letters of administration and guardianship in said several estates and for the appointment of appellant in place of L. B. Koehler as administrator and guardian, respectively, were likewise denied and disallowed.

As to the sufficiency of the evidence to sustain the finding that the said transfer of Lewis' property to his two brothers and sister was made in consideration of the agreement that he would be supported and maintained by his grantees so long as he should live, there can be no room for disagreement. Mr. Koehler, the brother-in-law, who had intimate personal knowledge of the family affairs and who was selected as the personal representative of all the parties whose estates are involved herein, testified to conversations had with all of the brothers and the sister Nonie with respect to the conveyances made by Lewis and the consideration for the same in effect as found by the court. George Darrah, a member of the board of supervisors of Shasta County, intimate friend and adviser of George and a friend of the family for more than thirty years, knew from conversations with George, Frank and Lewis and Nonie that said agreement and transfer had been made and the purposes for which they were made. Nonie, who had been released from the state hospital, was called by the appellant, and she testified that the claim of Lewis was just and should be allowed in accordance with said agreement. Whether she had been restored to competency does not definitely appear, but she was nevertheless called by appellant and her testimony was wholly intelligent. The deed and bill of sale executed by Lewis—unless it can be said that he voluntarily attempted to pauperize himself—corroborates the uncontradicted testimony of the witnesses above named. The finding of the probate court

on the issue of the transfer and its purpose could not have been made otherwise than as made by the court. ▮ The contention that the agreement of the two brothers and sister was a personal promise or agreement of the nature that dies with the promisor is not tenable. There is nothing in the agreement which could not be performed by an ordinary person for hire. The supplying of food, shelter and the necessities of life does not call for any peculiar skill or art on the part of the promisor. The allowance of a fixed sum of money would be a full and practical compliance with all that the promisors agreed to do in the circumstances of this proceeding. We are of the opinion that all that the brothers agreed to do was to furnish the means by which Lewis would be assured the reasonable care and attention that a blind person should receive and be furnished the necessities of life that are fit and suitable for a person in his situation. Anything in the way of actual personal attention on the part of the promisors was not a major or vital consideration of the agreement, but if it be so, it was an advantage which he had a right to waive. The contract was entered into with the express purpose of protecting Lewis during his remaining years against want, and its validity was not made to depend upon the contingency of death as to any other party to the agreement. It is not probable that said promisors gave any heed to or had any knowledge on the subject sufficient to advise them as to whether said matter should have been taken care of by a trust arrangement or whether their obligations would be enforceable in the probate court against their estates. The central purpose was to provide the blind brother with the necessities of life so long as *he* should live.

▮ Appellant asks, as one of the questions presented, whether a creditor of an insane person may enforce payment of a claim against his estate when the payment of such claim will render the insane person insolvent and thus a charge upon the state. Appellant has cited us to 32 Corpus Juris, pages 708, 709 and 14 Ruling Case Law, page 579, and to one or two cases outside our jurisdiction which hold that in cases where the ward has a family the court will not necessarily apply the estate of the ward in payment of his debts. It is said the property of the ward will not be applied to the payment of his general indebtedness, as distinguished from claims for

his present maintenance, until a sufficient fund is set aside for his support and that of his family. The leading case relied on is *Lemly* v. *Ellis,* 146 N. C. 221 [59 S. E. 683]. No authority of this state bearing upon the question is cited. The question is really not involved in this case. First, it is shown that none of the persons involved in this controversy have either wife or child or dependents; second, it appears that each one except Lewis will have an estate, after the payment of Lewis' claim, approximating $10,000; third, we can conceive of no decision that, in the circumstances of this case, would make a blind person who possesses reason a charge on the public in order to conserve the estate of incompetent persons, especially when a considerable portion of the incompetents' estate was created by the impecunious blind person. The fact that the wards in this case are amply able to pay their obligations makes it unnecessary to discuss the rights of general creditors. We may here add that Frank, since this appeal was taken, has died and nothing further will be required for his support. His estate will furnish a considerable addition to the estate of the other living incompetent.

 The attack on the finding of the court that $60 per month is not excessive for the support of a blind person, who in addition to his affliction is past 70 years of age and whose heart has been weakened by an attack of pneumonia and the toll of years, is without merit. The court may exercise its own knowledge in such commonplace matters. Lewis was recently a patient at a hospital and may need further medical attention at frequent intervals. His necessities will probably multiply in many ways as the days go by.

 Appellant claims that Mr. Koehler, the guardian, has taken an interest in Lewis' welfare which is antagonistic to his duties as guardian of the incompetents. This arises largely from the fact that Koehler knew of the agreements to convey said properties and the reciprocal duty of furnishing support to Lewis. It was claimed that he supplied his attorney with evidence tending to establish said claims and supported them generally. If the guardian of the incompetents had knowledge that Lewis had a just claim against their estates it was his duty to disclose all that he knew to Lewis. A guardian is not charged alone with the duty of protecting his ward's estate against fraudulent claimants but he is also

charged with the duty of honestly and fairly administering the affairs of the estate. If he has knowledge of an outstanding claim which should in justice be paid we know of no reason why he should not call it to the attention of the creditor, in the circumstances shown to exist in the instant case. To conceal the facts, or to do less than the guardian did in the instant case, would tend to impute a lack of a sense of justice on the part of a guardian which would question his fitness to fulfill the duties of his office.

We have also considered the objections made to the effect that the guardian who took Lewis into his home expected to be remunerated for his keep, and other charges with respect to the mismanagement of the said estates which appellant assigns as grounds which justify the disqualification of the guardian and administrator from acting as such officer. The probate court passed upon all of these questions of fact, overruling appellant's objections thereto and its rulings being supported by the evidence we are concluded thereby.

Appellant vigorously assails the order impounding $7,190 from which sum $60 per month will be paid for the support and maintenance of Lewis. The case of *Inyo Chemical Co.* v. *City of Los Angeles*, 5 Cal. (2d) 525 [55 Pac. (2d) 850], is strongly relied upon by appellant as an authority holding that it was error for the court to set aside a lump sum payable on the day of order made; that it should have found "the present value of the future sum computed in order to determine the amount of claims at the time made". Appellant, by way of illustrating his criticism of the lump sum theory, shows that the yearly interest on the sum of $7,190 would yield at the rate of six per cent $431.40 per annum. No method could be devised in a case such as this that would be free of difficulties. The court here was attempting to make respondent Lewis secure in an income sufficient for his support. There is nothing grossly inequitable, or at all inequitable, about the order impounding approximately $2,400 to be paid by each estate. There is evidence to the effect that the value of the property which Lewis conveyed was between $10,000 and $12,000. If Lewis had been charged the rates based on appellant's figures as to what would be a reasonable charge for his keep while in

the care of said brothers and sister for the full period of ten years, said aggregate sum would fall far below the value of the lands and livestock which Lewis parted with, to say nothing of the profits which the brother and sister reaped in the transaction. Add to this the most that he can receive at the rate of $60 per month for a period of 9.47 years, and it would still be less than the value of the property which he parted with.

The Inyo Chemical Company case is wholly different from the instant case in its facts. That case was one involving the value of 90,000 tons of destroyed trona estimated at the selling price of the ore less the cost of production extending into the future for a period of thirty-six years. The court awarded as damages the total profits which would have been made during said period as profits to be paid in a lump sum. This court held that the trial court adopted an erroneous method of computing damages and ordered the case reversed with instructions "to take competent evidence to establish the present value of those profits". Here the impounded fund had its inception in property furnished by Lewis. The trona case sounded in damages. The trona case was an action at law; the instant case is within the equity jurisdiction of the probate court. Section 953 of the Probate Code (formerly sec. 1648, Code Civ. Proc.), provides that "If there is any claim not due, or any contingent or disputed claim against the estate, the amount thereof, or such part of the same as the holder would be entitled to if the claim were due, established or absolute, must be paid into court, and there remain, to be paid over to the party when he becomes entitled thereto; or, if he fails to establish his claim, to be paid over or distributed as the circumstances of the estate require." *Miller* v. *Miller*, 171 Cal. 269 [152 Pac. 728], presents a situation wholly different from the one before us. There two actions were brought by the mother and the sister, respectively, of E. O. Miller, deceased. The actions were based on the rejection of claims against the estate of E. O. Miller, deceased. Said E. O. Miller and his two brothers signed a writing by which each agreed to deposit $480 in a certain bank on October 15th of each year. From this fund the mother and sister were to draw $75 and $50, respectively, on the first day of each month. The concluding paragraph of said instrument read:

"We consider this agreement binding upon us while living and chargeable against our several estates in case we should pre-decease said or either of said beneficiaries."

During the lifetime of E. O. Miller the payments were regularly made and after his death one payment was made on behalf of the estate. Before the fifteenth day of the following October the plaintiffs filed claims against E. O. Miller's estate. The court held the claims were for "moneys to become due and payable" each year as "per the attached agreement". The claims were rejected and suit was instituted to establish the right of each plaintiff to the allowance of her demand as a contingent claim against the estate.

The matter came before the court upon demurrer. This court held that while it was proper to present a contingent claim before it became due, an action thereon may not be maintained until after the happening of the contingency. It was therefore held that the action was prematurely brought. Another reason given for the court's decision was that the claims were of such a nature that the court could not by any possibility determine what the segregated amount would be, if absolute. The decision reasoned that if the claimants should have died before the next instalment should have been due, under the agreement nothing would ever have been payable by the estate, in view of the contract and obligations created by it. Among the many points of distinction between the Miller case and the instant case, it will be observed that there was nothing due in the Miller case, while in the instant case there was a considerable sum due on a continuing claim at the time it was allowed. Death of Lewis alone could terminate payment. The mortality tables, which have in recent years become universally adopted as the method of determining life expectancies, made it reasonably certain that Lewis' expectancy of life was 9.47 years. The vital and material distinction between the two cases is pointed out in the Miller case itself. It is there expressly stated that the equity side of the court may be invoked to protect the owners of contingent claims which were mature after the period within which distribution may take place. It there expressly said: "These complaints before us are *not bills in equity.* While each asks for a determination of the status of the claim upon which suit is brought, each is frankly based upon a rejected demand for moneys *not yet due,* and

there is neither pleading nor prayer with reference to the condition of the estate, the ability of the defendants to provide for future payments nor the desirability of creating a fund to meet the annual demands of the plaintiffs. . . . There was no breach until the date of payment arrived.'' Everything pointed out as lacking in the Miller case appears at large in the instant case. The claims set forth in detail the circumstances in which the agreements were made, the condition of the estates affected thereby, the ability of the personal representatives to provide for future payments, and the desirability and necessity of creating a fund to meet the demand of the claimant. The claims present a complete bill in equity. The probate court, while sitting in matters of probate, is a court of general jurisdiction, and in determining any questions arising in the administration of an estate which it is authorized to decide may bring to its aid ''the full equitable and legal powers with which as a superior court it is invested.'' (*Estate of Bell,* 168 Cal. 253 [141 Pac. 1179]; *Verdier* v. *Roach,* 96 Cal. 467 [31 Pac. 554].) In *Sime* v. *Hunter,* 50 Cal. App. 629 [195 Pac. 935], with the Miller case before it, it is held that in a suit in equity setting forth the condition of the estate, the ability of the personal representative to provide for future payments and the necessity for creating a fund to meet the demands of the claimant, the court may, in accordance with section 1648 of the Code of Civil Procedure (sec. 953, Probate Code), create a fund to meet the demand. In *Newman* v. *Burwell,* 216 Cal. 608 [15 Pac. (2d) 511], we made reference to the Miller case, and held that that case offered no obstacle to the conclusion arrived at in the Newman case for the impounding of a fund sufficient to meet the monthly instalments accruing between the time of the decedent's death and the time when the minor daughter, the beneficiary under the order, should reach her majority. The differences pointed out as to the controlling facts of the two cases were that in the Miller case there was neither ''pleading nor prayer with reference to the condition of the estate, the ability of the defendants to provide for future payments nor the desirability of creating a fund to meet the annual demands of the plaintiffs''. The decision then proceeds to say that the Newman case is one in equity to establish the claim and to impound a fund with which to pay off the same as the

instalments accrue. It expressly says that which is true of the instant case, that the pleadings or claim contain all the necessary allegations referred to in the Miller case and holds that the court had the power to impound the fund as prayed for by appellant.

Respondent, as additional grounds for the affirmance of the orders herein, calls to our attention the finding of the probate court to the effect that there was an equitable compromise made as between the attorney of Lewis and the guardian. This is based on the substantial grounds that a trust arising out of an express contract existed in favor of Lewis, and if his claim was repudiated he would be entitled to bring an equitable action to impress said trust upon the properties held by said wards. That such an action, aside from its merits, would have retarded the settlement of said estates in which all the actors were well advanced in years, is obvious. The court was fully informed as to the likelihood and merits of such an action and was influenced by that contingency, as well as by the justice of the matter. That the probate court was satisfied that the guardian and administrator was acting in good faith at every step of the proceedings and for the best interests of all parties herein is made certain by its findings. The matter originally came before Honorable A. F. Ross upon presentation for the allowance of said claims. Later the settlement of the account was heard by Honorable H. S. Gans. Much time was given by each to the consideration of said matters.

If appellant's prediction that Lewis will not survive the expectancy of nine and a half years should come true, the residue of the impounded fund will revert as assets of said estates. If he should live that long, it cannot be said that $60 per month for his maintenance is an extravagant allowance. We are of the view that the decision follows the lines of natural justice, and is in harmony with the modern trend of decisions dealing with the question of contracts entered into for the support and maintenance of the aged, sick and unfortunate.

It may finally be said that both judges who heard the matter were familiar with every phase of said controversies, and each was fully considered by them in several chambers proceedings, all parties being present, and in formal court sessions. Both judges arrived at the same conclusion. In

summing up the entire matter the court stated in its opinion that the guardian had acted openly and with consultation with counsel and court with a desire to solve the questions presented for the best interests of said parties to the proceedings, and that it would be for the best interests of said parties to continue his trust, "watched and counselled as he will be by both court and counsel".

Upon an examination of the case as disclosed by the record we are in agreement with the court's conclusion.

The orders and matters herein appealed from are affirmed.

Curtis, J., Thompson, J., Shenk, J., Waste, C. J., Langdon, J., and Edmonds, J., concurred.

Rehearing denied.