## OCTOBER TERM, 1944

In the Matter of the Estate of Eugene E. Durrin
and Dixie Ann Durrin, Minors,

THE UNITED STATES FIDELITY AND GUAR-
ANTY COMPANY, Appellant,

v.

JOHN E. DURRIN, GUARDIAN, Respondent.

(No. 2311; Dec. 13, 1944; 154 P. 2d 348)

2

For the Appellant the cause was submitted on the brief of L. A. Bowman, of Lovell, Wyoming.

For the Respondent the cause was submitted on the brief of Ernest J. Goppert, of Cody, Wyoming.

4

6

## OPINION

BLUME, Justice.

On February 7, 1944, John E. Durrin filed a petition in the District Court of Big Horn County, Wyoming, to be appointed guardian of Eugene E. Durrin, of the age of nine years, and Dixie Ann Durrin, of the age of five years. The petition alleged that the petitioner is the father of the minor children, living with him as residents of Lovell, in Big Horn County, Wyoming; that the estate of the minors consists of one and one-half shares each of the capital stock of the Yale Petroleum Company, a Wyoming corporation, and that the stock is of the approximate market value of $3,000; that the petitioner is the only relative of the minors who resides in Big Horn County, Wyoming; that by a decree of the District Court of Yellowstone County, Montana, petitioner was granted the sole custody and control of the minor children and that the whereabouts of the mother of the minors, namely, Georgia G. Durrin Carr, formerly Georgia G. Durrin, is unknown, and that her last residence address was Berkeley, California. Attached to the pe-

tition is a decree entered in the District Court of Yellowstone County, Montana, divorcing the petitioner from his wife, Georgia G. Durrin, and granting the custody and control of the children to petitioner. On February 7, 1944, the petitioner was duly appointed as guardian. The petitioner took his oath as such and gave a bond as required in the sum of $3,000 with the United States Fidelity and Guaranty Company, a corporation, as surety. The property of the minors was duly appraised at the sum of $1,650.00, being the sum of $825.00 for each of the interests of the minors in the Yale Petroleum Company. Thereafter, on March 8, 1944, John E. Durrin, the duly appointed guardian of the minors above mentioned, filed a petition in the District Court of Big Horn County, Wyoming, to exchange the interests of the minors in the Yale Petroleum Company for stock in the Texas Corporation, the one and one-half shares of each of the minors to be exchanged for 39 shares of the Texas Company. On March 11, 1944, the Court duly authorized the exchange to be made. Thereafter on May 16, 1944, the United State Fidelity and Guaranty Company intervened in the matter, objected to the exchange and the order of the court on the following grounds:

First, that the order authorized an exchange of personal property which is not authorized by the laws of the State of Wyoming;

Second, that the said order purports to authorize a trade or exchange of three shares of Yale Petroleum Company stock which is entirely unincumbered for 78 shares of Texas Company stock which is incumbered;

Third, that the said order in effect authorizes an investment in the capital stock of the Texas Company, a private corporation, contrary to the provision of

Art. III, Section 38, of the Constitution of the State of Wyoming, which reads as follows:

"No act of the legislature shall authorize the investment of trust funds by executors, administrators, guardians, or trustees, in the bonds or stock of any private corporation."

Issues upon the objections filed by the United States Fidelity and Guaranty Company were duly joined and the parties entered into a stipulation as to the facts, as follows:

1. That the Yale Petroleum Company is a Wyoming Corporation, duly organized and doing business under the laws of the State of Wyoming.

2. That at all times mentioned herein the said corporation had 2,250 shares of capital stock outstanding with a par value of $100.00 per share.

3. That of said 2,250 shares of stock outstanding three shares were purchased by John E. Durrin, the father of Eugene E. Durrin and Dixie Ann Durrin, minors, at a total cost of $900.00, and one-half thereof was given to each of the said minor children herein.

4. That at all times mentioned herein, the Texas Company was a corporation with 10,875,000 shares of common stock outstanding of the par value of $25.00 for each share, and having a funded debt of $11,973,000.00 with a present working capital of approximately $175,000,000.00. That the said Texas Company stock is listed on the New York Stock Exchange, and during the periods mentioned herein has been quoted at from $48.00 to $50.00 per share; and that it has been paying annual dividends of $2.00 per share per annum.

5. That the Yale Petroleum Company stock is an unlisted stock and no dividends have ever been paid upon the same.

6. That a contract and agreement has been entered into between the Texas Company and all of the stockholders of the Yale Petroleum Company, including

the Guardian herein, for an exchange of stock and re-organization of the character as set forth and provided in Section 112 (b) (3) and 112 (g) (1) (b) of the Internal Revenue Code of the United States of America, wherein and whereby the stock of the Yale Petroleum Company is to be exchanged on the basis of twenty-six shares of Texas Company Stock for each share of stock in the Yale Petroleum Company; and that said exchange has been consummated except for the three shares owned by Eugene E. Durrin and Dixie Ann Durrin, Minors.

7. That the said exchange is a non-taxable exchange and transfer of stock certificates; and that if the same be not approved, then the Income Tax liability on a comparable sale of said property would be approximately $400.00.

8. That there is no ready sale or market for stock of the Yale Petroleum Company and that there is a ready market and sale possibility for the stock of the Texas Company."

Thereafter, and on June 26, 1944, the court entered an order overruling the objections of the United States Fidelity and Guaranty Company, a corporation, and authorizing the guardian to proceed to make the exchange as proposed. From that order the United States Fidelity and Guaranty Company has appealed to this court.

The trust fund involved in this case was established by the father of the minors herein, who is also their guardian. He gave them the shares of the Yale Petroleum Company. If it were not for him, the minors would have no property. He could have given them the shares under a written trust agreement, reserving the power to manage the property in such manner as might be deemed proper by the trustee or guardian. He now wants to increase the value of the shares by agreeing to the proposal agreed to by all the holders of stock of the Yale Petroleum Company. It appears

from the facts herein that it will be distinctly to the benefit of the minors to do so, and it should be, accordingly, permitted, if it can be done under the rules of law or equity.

It is, however, contended herein that our statutes do not authorize an exchange of stocks by the guardian, and that to do so would be unlawful. The subject of exchange of property by a guardian is considered in 39 C.J.S. 132. It was held in Freeman v. Wilson, 74 N.C. 368, that a guardian has power to exchange personal property of his ward which he thinks is not safe to hold, for other personal property, and if his discretion has been honestly exercised in the transaction the courts will not hold him liable for the results. If he can do so, according to this decision, on his own motion, he could, of course, do so with approval of the court. In Title Guaranty & Surety Co. v. State of Missouri, 105 Fed. 2d 496; Commander v. Bryan (Tex. Civ. App.), 123 S.W. 2d 1008; Garrett v. Reid-Cashion Land & Cattle Co., 34 Ariz. 245, 270 P. 1044, it was held that a guardian cannot exchange property without an order of court. In Bohanan v. Riddle, 145 Okl. 301, 293 P. 1031, and Alexander v. Windsor, 107 Mont. 152, 81 P. 2d 685, it was held that a guardian cannot make an exchange of property even under an order of court, the Montana decision being mainly based on the fact that in the exchange a large indebtedness was assumed by the minor, and a transaction of that nature has been condemned in a number of cases cited in the Montana case.

The Montana and Oklahoma cases are easily distinguishable from the case at bar. It appears from the facts herein that there is no market for the stock of the Yale Petroleum Company, making a sale thereof difficult, and the amount to be realized therefrom problematical, and that even if a reasonable sale could

be made, loss to the minors, as compared with the exchange which is hoped to be made, would be almost a certainty, if for no other reason than the fact that a large income tax, by reason of capital gains, would have to be paid. Furthermore, the proposed exchange, if it can properly be called such, is not an ordinary exchange. The facts disclosed by the records indicate that the minors have merely some rights in the Yale Petroleum Company, over which they may have little or no control, and the value of which, under the circumstances, might be wholly problematical. It appears that this Company is a corporation with 2,250 shares of stock, of which the minors herein have only three shares; that all the stockholders have agreed to exchange their stock in that corporation for stock in the Texas Company so that the two companies may be consolidated, and the Yale Petroleum Company, as such, is presumably intended to be eliminated. A corporation may be dissolved under the laws of this state by a two-thirds vote of the stock held by the stockholders. Section 28-1104, Rev. St. 1931. After such dissolution has been so ordered, the trustees or directors must proceed to sell the property, pay the debts and wind up the affairs of the corporation. Section 28-1106. Hence, the minor children herein are wholly at the mercy of the remaining holders of stock, and the result might be that their rights would be confined to a cash payment for their stock, the amount of which would be uncertain, whereas if the proposed exchange is perfected, they will receive stock of the approximate value of $4,200.00, which is an increase of nearly 450 per cent. over and above the amount originally paid for their stock of the Yale Petroleum Company. There is no possible way by which the minor children can prevent the elimination and dissolution of the Yale Petroleum Company. Their stock would, in case of such elimination, which is practically

certain, disappear; they would have to take what they could get. So that, in its ultimate analysis, the proposed transaction herein might be said to be not so much an exchange of stock of one company for that in another, as an acquisition of a definite right in the consolidated company in place of an uncertain right in a company which, for all practical purposes, may be said to have ceased to exist, or which in any event stands in danger of no longer existing. Of course, the remaining stockholders and the Texas Company might, out of generosity, or for some other reason, choose to adopt a method different from that which seems possible or probable, in dealing with the rights of the minors, but, in any event, it appears to be clear that the proposed exchange is not an ordinary exchange, but stands on its own peculiar footing, placing the rights of the minors in a situation of uncertainty to which they ought not to be exposed, and if the statutes of this State relating to minors do not furnish an adequate remedy for their protection, as seems to be true, the rules of equity should be invoked to supplement the statutory provisions.

Probate courts are of comparatively recent development. Probate law, if we can properly include that relating to infants and their property, grew out of and has its foundation in equity. The courts of chancery for centuries exercised the powers now exercised by probate courts. Woerner on Guardianship, p. 50; Pomeroy on Equity Jurisprudence (5th Ed.) Vol. 4, Section 1301. Probate courts have now largely supplanted courts of chancery in the exercise of probate jurisdiction, but it has not done so entirely, if indeed it could do so under a constitutional provision which vests in the district court all powers in equity as well as at law. See Wilson v. Roach, 2 Cal. 362; Reformed Presbyterian Church v. McMillan, 31 Wash. 643, 72 P.

502. See a full discussion of the subject in Pomeroy, supra, Section 1153, and the exhaustive notes attached to Section 1154, which set out the rules of relationship of probate law and equity as announced in the various states in this country. See further In Re Reiser's Estate, 57 Utah 434, 195 P. 317; Weyant v. Utah S. & T. Co., 54 Utah 181, 182 P. 189, 25 Am. Jur. 22; Toland v. Earl, 129 Cal. 148, 61 P. 914; In Re Cornaz' Estate, 8 Cal. 2d 347, 65 P. 2d 784; Pennie v. Roach, 94 Cal. 515, 29 P. 956; Urbach v. Urbach, 52 Wyo. 207, 224, 73 P. 2d 953. In 39 C.J.S. 14-15, it is stated:

"Ordinarily courts of equity have the power to control and direct guardians in the performance of their trust so as to secure the proper care of the person and property of their wards. * * * The original jurisdiction of courts of equity in such matters is not affected by statutory provisions conferring jurisdiction on probate courts, unless the statute contains express words of exclusion or manifests a clear intention that it shall so operate, and the jurisdiction of equity is concurrent with that of the courts on which the statutory jurisdiction is conferred. Where, however, such jurisdiction has been conferred on probate courts, a court of equity will not exercise its jurisdiction and supersede the probate court in the management of the estate of a minor, except in extraordinary cases and for special reasons."

In Verdier v. Roach, 96 Cal. 467, 31 P. 554, the court stated:

"Where the limited jurisdiction of a distinct probate court has proved to be inadequate, the original jurisdiction of courts of equity over the administration of estates has been invoked. Our superior courts have both probate and equity jurisdiction, so that whenever, in the course of the administration and settlement of estates, our probate statutes are found to be inadequate to authorize and accomplish all that a court of equity is authorized to do in such cases, our superior courts may exercise their equity powers in connection

with, and as incidental to, their powers in probate matters, to the extent necessary to a complete administration and distribution of estates; provided, of course, that nothing be done in contravention of any statutory provision."

In Re Bell's Estate, 168 Cal. 253, 141 P. 1179, 1180, the court stated:

"The fact that, acting in probate, it (the court) may be called upon to apply legal or equitable rules or principles in considering a question it is called upon to determine does not affect its jurisdiction to do so. The superior court, sitting in probate, is a court of general jurisdiction, and, in determining any question arising in the administration of an estate which it is expressly authorized to decide, it may bring to its aid the full equitable and legal powers with which, as the superior court, it is invested."

And there is no particular reason why in this case the proceeding in the trial court may not be considered a proceeding in probate as well as one in equity. See In Re Thompson's Estate, 101 Cal. 349, 35 P. 991. The case of In Re New et al., 2 Chan. (1901) 534, presents features similar to those in the case at bar. The question was whether or not a trustee could exchange stock, though the trust instrument, which gave the trustee the power to administer the trust, did not provide for such exchange. In that case conditions had arisen which made it desirable that the corporation, whose stock the trustees held, should be reconstituted, by winding up the corporation and forming a new corporation which would take over its assets. The new company was to be like the old company except that the capital stock was to be larger and the new company would have power to issue debentures. The shares in the old company were to be represented by fully paid-up shares of the new company. Every shareholder who was sui juris agreed to the scheme, but some shares were held by the trustees on behalf of persons

not sui juris. It was held that a court of equity had the power to authorize the exchange of the stock as above mentioned if, under the facts, it appeared, as it did in that case, that the exchange would be beneficial. See Restatement of the Law of Trusts, p. 677. We think that the circumstances in the case at bar also justified the order made by the trial court.

It is contended, however, by appellant that Section 38 of Art. III of our Constitution prohibits investment in the bonds and stocks of private corporations, providing, as it does, that "no act of the legislature shall authorize the investment of trust funds by executors, administrators, guardians or trustees in the bonds or stock of a private corporation." The same point was raised in the case of Nagle v. Robins, 9 Wyo. 211. In that case it was contended on the one hand that the constitutional provision declared a policy that a fiduciary should not invest in any bonds or stock of a private corporation; it was contended, on the other hand, that this provision merely was a restraint on the legislature, and that it was not the intention to deprive the courts of the power to control investments of fiduciaries which they had exercised for centuries. Examining the original briefs filed in that case, we find it contended that courts had always been conservative in controlling such investments, but that legislatures had not always been so, and that that was the reason for the constitutional provision. The court in the foregoing case did not squarely meet the contentions so made. It was held, however, that an investment in stocks of a private corporation to protect stock already held was not in violation of the constitutional provision. In the case at bar it may not be inappropriately said that the stock in the Texas Company is sought to be acquired in order to protect the investment which the minor children have now, and it would seem that

the reason of the rule laid down in the Nagle case may well be said to be applicable in the case at bar. It seems advisable, however, to consider the question from a somewhat broader viewpoint.

So far as the statutes of this State are concerned, the court has the power to authorize such investments, for it is provided in Section 50-316, Rev. St. 1931, that the court "may authorize and require the guardian to invest proceeds of any sale and any other of his ward's money in his hands in real estate or in federal farm loan bonds, or in any other manner most to the interest of all concerned." This would include the right to invest in such securities as would appear to be proper to the court. In Re Paulsen's Guardianship, 229 Wis. 262, 282 N.W. 36. The broad language contained in this statute was contained in the statute as it was enacted at the first session of the legislature after the constitution was adopted, and when, we presume, the legislature had the various constitutional provisions clearly in mind. It is rather strange that the language above mentioned should have been made so broad if the constitutional provision above mentioned was meant to prohibit the court from authorizing investments in the securities therein mentioned. Furthermore, at the same session of the legislature was enacted Section 50-302, Rev. St. 1931, reading as follows:

"When it appears to the satisfaction of the court or judge upon the petition of the guardian, that for the benefit of his ward his real estate, or some part thereof, should be sold, and the proceeds thereof put out at interest, or invested in *some productive stock*, or in the improvement or security of any other real estate of the ward, his guardian may sell the same for such purpose, upon obtaining an order therefor."

It is strange that the legislature at so early a date, with constitutional provisions clearly in mind, should

so recklessly disregard the provision above mentioned, if the contention of the appellant herein is correct. These laws have been in existence for nearly fifty-five years, so that it would seem that it behooves this court to proceed with considerable precaution before concurring in the broad contention here made by the appellant.

It is true that the Supreme Court of Alabama, relying to some extent upon some Pennsylvania decisions stated in White v. White, 230 Ala. 641, 162 So. 368, under a constitutional provision such as here under discussion that such provision established a policy that a fiduciary should not invest in stocks or bonds of a private corporation. In the later decision of Sims v. Russell, 236 Ala. 562, 183 So. 862, the court, speaking of that provision, stated:

"The section is directly aimed at legislative acts, corporate charters and the like, declaring their bonds and stocks available for legitimate investment of trust funds in the hands of guardians, etc. * * * Constitutional limitations on legislative powers, such as section 74 (the constitutional section under consideration) running into the indefinite future, are to be strictly construed. We conclude, therefore, that it is not the purpose of section 74 to exclude, as a basis for credit and security for loans, the whole body of corporate securities, which, in our day, are recognized as sound security for loans by prudent investors throughout the business world."

The court, it is true, did not quite go to the extent of holding direct investments in such securities to be proper, but its statements above mentioned are significant. Pennsylvania had a constitutional provision similar to that here under discussion. The courts, however, held that the provision did not apply in cases where a trustee had been given discretionary power under a trust instrument, as well might have been provided by the father of the minors in this case. More-

over, it was evidently found that the interpretation given to the provision as applied to other situations was not practical, and the constitution was amended in 1933, giving the legislature the power to prescribe the kind of investments that can be made by fiduciaries. In Re Wood's Estate, 130 Pa. Super. Ct. 397, 197 Atl. 638. The court, after referring to this change in the constitution, incidentally remarked:

"There is much less objection to investments in stocks today than there was a century ago. This is shown by the fact that the shrewd, conservative, and experienced financier frequently authorizes trustees appointed by him to invest in stocks, realizing that circumstances may arise where they may be safer than bonds, although this is not the general rule. In periods of threatened inflation arising from a depreciated currency, common stock may be a safer investment than bonds."

The subject of the constitutional provision here considered is mentioned in Vol. 2, Scott on Trusts, p. 1224. The author was the Reporter on Trusts for the American Law Institute, and has evidently given a life-time study to the subject of trusts. He states:

"In a few states there is a provision in the constitution that the legislature shall not authorize the investment by fiduciaries in bonds or stock of any private corporation. According to the prevailing view, the purpose of such provision is not to make an investment in corporate bonds or stock improper, but to forbid the legislature to pass special acts making the bonds or shares of particular corporations proper trust investments."

We think it clear that the constitutional provision above mentioned meant to prohibit fiduciaries from investing in the prohibited securities on their own responsibility, but we do not think it likely that it meant to go any farther than that. It is hardly probable that it meant to prohibit the courts, which had for centuries

supervised investments of minors and beneficiaries of trust, from continuing to do so as they had done before. If it had meant to do so that could have been easily accomplished by the direct statement that investments by fiduciaries should not be made in the securities mentioned. But that is not the language. There is considerable difference between cases where a statute authorizes a fiduciary to invest in stocks and bonds of a private corporation, and cases where no such express statutory power exists. In the former cases such fiduciary would be authorized to make investments upon his own responsibility; it would not be necessary to ask the court for authority, and he would not be held responsible for the results, provided, of course, that he would exercise care and prudence in his selection. By prohibiting the enactment of such statute, as our constitution does, it acts as a specific restraint upon him in making investments, and he cannot, as already stated, make those mentioned in the constitution unless the court authorizes that to be done. The constitutional provision in question must be construed in pari materia with the provision which grants to the district court plenary power in all cases of equity and law, including probate cases. As such, it has the powers formerly exercised by chancery, in which was inherent the power to regulate and control and supervise investments by fiduciaries. Section 38, Art. III, supra, is at least no direct restraint upon that power, and we agree with the Alabama court that such a provision running into the indefinite future, relating as it does to financial or economic matters, should be strictly construed. Economic and financial conditions change from generation to generation and even from decade to decade. It is hardly possible that the constitutional convention ignored so patent a fact. In the early days of Wyoming, loans upon good real estate security could be made to net interest at 8 to 12 per

cent. or even higher. The rate of interest gradually decreased. Hardly any good real estate loans are avail-now to any investor even at a low rate of interest, since the agencies of the Federal Government · have occupied the field. The building and loan association in Cheyenne, for instance, and in other places in this State, have been practically driven out of existence. Bonds of the State or its subdivisions or agencies are almost wholly unavailable to any fiduciary, and if available at all, it is at an exceedingly low rate of interest. And unless we are prepared to say—following a precedent set for many years by the English courts —that fiduciaries must, in the absence of finding good real estate security, invest in securities of the Federal Government or its agencies, it may be very difficult for them to find suitable investments. We think that we should not take such a position. That should be left to the legislature, if it desires to establish such a policy. In any event, we consider the construction put by us upon Section 38, supra, as the only sound and safe construction, in view of the fact that neither ourselves, nor any one else can now foresee what the economic and financial conditions of the future may be. If the future should show that no investments such as mentioned in Section 38, supra, should be made, the remedy is easy. The legislature can step in any time and forbid them, or regulate them, as it may deem proper from time to time. A provision directly prohibiting such investments has no place in the constitution. It is a matter for the legislature which is always able to meet present conditions, and we believe that the framers of the constitution had that in mind when it made the provision in question in the language in which it is cast.

We are not called upon at this time to lay down any rules which should be followed if and when applica-

tions are made to permit investments in stock, but we might add a few words. The subject is discussed by Scott, supra, Section 227, 11, wherein it appears that while many courts do not approve such investments, they are permitted in Kentucky, Maryland, Massachusetts, Michigan, Mississippi, Ohio, Rhode Island and Vermont. Scott takes the view that under some circumstances at least, as for instance when inflation threatens, it is often more prudent to invest, part of the assets at least, in stocks rather than in bonds. It is needless to say that courts should be extremely careful in permitting such investments, and in no case unless in shares of a company which has been proven for a long time to be sound. Written proof of men thoroughly conversant with securities should ordinarily be required by the court to be filed with the papers in the case. And if necessary a guardian ad litem, who is conversant with securities should be appointed, so as to protect the interests of minors. We think that the court in the instant case was sufficiently advised as to the facts, and the judgment herein entered should be approved. It is so ordered.

*Affirmed.*

KIMBALL, C. J., and RINER, J., concur.