DAVIS, Justice.
*1095 [¶1] Mark Gordon, in his capacity as Treasurer of the State of Wyoming,[1] filed a complaint for declaratory judgment and permanent injunctive relief challenging on its face the constitutionality of legislation that created the State Capitol Building Rehabilitation and Restoration Oversight Group (oversight group). The district court granted the State's motion for summary judgment, holding that Gordon had failed to establish that the legislation facially violated the Wyoming Constitution. Gordon appeals from the district court's order. We reverse and remand.
ISSUES
[¶2] Gordon states the issues for this Court's consideration as follows:
1. Does the Capitol Repair Legislation facially violate Article 3, Section 31 of the Wyoming Constitution ?
2. Does the Capitol Repair Legislation facially violate Article 2, Section 1 of the Wyoming Constitution ?
FACTS
[¶3] In 2014, the Wyoming Legislature enacted legislation to effectuate restoration of the state capitol and Herschler state office buildings.[2] The statutes provided in pertinent part:
§ 9-5-110. State capitol building rehabilitation and restoration project; definitions.
(a) As used in W.S. 9-5-109 through 9-5-113 :
(i) "Advisory task force" means the joint legislative and executive advisory task force on capitol building rehabilitation and restoration created by W.S. 9-5-109(k) ;[3 ]
(ii) "Department" means the department of administration and information;[4 ]
(iii) "Oversight group" means the oversight group created by W.S. 9-5-111 ;
(iv) "Project" means the state capitol building and Herschler state office rehabilitation, restoration and renovation project described in W.S. 9-5-112, including all components of the project.
§ 9-5-111. State capitol building rehabilitation and restoration project oversight group; creation; duties.
(a) There is created a state capitol building rehabilitation and restoration oversight group comprised of:
(i) The governor;
(ii) The president of the senate and majority and minority floor leaders of the senate;
(iii) The speaker of the house of representatives and majority and minority floor leaders of the house;
(iv) A member of the senate selected by the president of the senate and a member of the house selected by the speaker of the house not later than March 31, 2014 and by March 31 of each odd numbered year thereafter.
*1096 (b) A quorum of the oversight group shall consist of the governor and a majority of the legislative members of the oversight group. Except for approvals under W.S. 9-5-112(e) and (f), actions of the oversight group may be taken by vote of a majority of the legislative members in attendance or by their proxy vote and the governor.
(c) The oversight group shall have the powers and duties as provided by law.
* * *
§ 9-5-112. Capitol building rehabilitation and restoration project; components; oversight.
(a) The department shall proceed with level III design and construction for renovation, rehabilitation, restoration and addition to the state capitol building, the Herschler state office building and the connection between the two (2) buildings in accordance with presentations to the management council of the legislature on November 18, 2013 and January 9, 2014, and the provisions of W.S. 9-5-109 through 9-5-113. The project shall proceed as a single funded project with the following components:
(i) Capitol building restoration and rehabilitation;
(ii) Herschler state office building renovation, rehabilitation and additional construction including a structure connecting the Herschler building and the capitol building and addition to the Herschler building;
* * *
(v) Furniture, fixtures and equipment for the project;
(vi) Contingency costs, costs of fees and other costs associated with the project.
(b) The level III design shall allocate space within the capitol building to meet legislative needs, needs of the governor's office and security needs in the capitol building as determined by the oversight group and the governor. In determining space allocations under this subsection the oversight group and the governor shall be guided by level II studies for the capitol building restoration and rehabilitation conducted in 2013. To the extent the oversight group and the governor determine that all such needs cannot be accommodated within the capitol building, legislative committee rooms and offices for committee chairmen and associated legislative session staff may be within the structure connecting the capitol building and Herschler state office building. If the governor and the oversight group determine that space will exist in the capitol building in excess of the needs of the legislature, the governor's office and capitol building security needs, then the department, in consultation with the advisory task force, shall provide one (1) or more design alternatives to the oversight group and governor for review and approval, allocating available remaining space to the statewide elected officials with offices within the capitol building as of April 1, 2014.
* * *
(e) No funds shall be expended for the purposes of construction until final design plans for the project have been submitted to the advisory task force for review and comment and to the governor and the oversight group for review and a majority of the legislative members of the oversight group has recommended approval and the governor has approved the plans.
(f) The department may expend funds appropriated by the legislature for the project to implement the design, renovation, restoration, rehabilitation, construction and other project components which have been included in the final design plans approved under subsection (e) of this section. Any change order to the approved final design plans in excess of one hundred thousand dollars ($100,000.00) or in a cumulative amount in excess of one million dollars ($1,000,000.00) shall require the approval of a majority of the legislative members of the oversight group and the governor.
§ 9-5-113. Capitol building rehabilitation and restoration project; design and construction execution.
(a) Notwithstanding W.S. 9-5-101 through 9-5-108,[5 ] for all components of the project:
*1097 (i) The construction management program within the general services division of the department shall be the primary fiscal and contracting agent;[6 ]
(ii) Level III design and construction shall proceed under the immediate direction and control of the governor in accordance with the provisions of W.S. 9-5-110 through 9-5-113 ;
(iii) In addition to those items required by law to be presented to the advisory task force for advice, as recommended by the oversight group and directed by the governor, the department shall consult with the advisory task force on other project items as the project progresses.
2014 Wyo. Sess. Laws ch. 40, § 1.
[¶4] As the above provisions reflect, the 2014 legislation did not designate the state treasurer as a member of the oversight group, nor did it provide that the state treasurer's approval was required for contracts related to the capitol restoration project.
[¶5] In February 2016, the Office of the Attorney General for the State of Wyoming issued a formal opinion addressing the question of the treasurer's role under Article 3, § 31 in the capitol restoration project. Wyo. Atty. Gen. Op. 2016-001, 2016 WL 870371 (Feb. 2, 2016). In the opinion, the attorney general's office concluded that Article 3, § 31 did not require the treasurer's approval of capitol restoration project contracts. Id. at 1. The opinion stated, however, that Article 3, § 31 did not bar the legislature from passing statutes providing for treasurer participation in the process.
[¶6] In May of 2016, Gordon filed a complaint asserting that the legislation was illegal on its face because it violated Article 3, § 31 of the Wyoming Constitution, which provides:
All stationary, printing, paper, fuel and lights used in the legislature and other departments of government shall be furnished, and the printing and binding of the laws, journals and department reports and other printing and binding, and the repairing and furnishing the halls and rooms used for the meeting of the legislature and its committees shall be performed under contract, to be given to the lowest responsible bidder, below such maximum price and under such regulations as may be prescribed by law. No member or officer of any department of the government shall be in any way interested in any such contract; and all such contracts shall be subject to the approval of the governor and state treasurer.
Wyo. Const. Art. 3, § 31 (emphasis added). Gordon argued that the legislation violated this provision because it did not provide for the state treasurer's approval of contracts for the capitol restoration project, which involved "repairing and furnishing the halls and rooms used for the meeting of the legislature and its committees."[7]
[¶7] Gordon further asserted that the legislation violated Article 2, § 1 of the Wyoming Constitution, which states:
The powers of the government of this state are divided into three distinct departments: The legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this *1098 constitution expressly directed or permitted.
Wyo. Const. Art. 2, § 1. Gordon argued that this provision prohibited the legislature from enacting legislation that usurped or ignored the state treasurer's express power to approve contracts for repairing and furnishing the portions of the state capitol used for meetings of the legislature and its committees. He sought judgment declaring the legislation to be unconstitutional and entry of a permanent injunction prohibiting the oversight group from entering into contracts for the capitol restoration project without his approval.
[¶8] The State filed an answer denying Gordon's claims. Gordon then filed a motion for partial summary judgment, contending that as a matter of law the capitol restoration legislation facially violated Article 3, § 31 because it authorized the oversight group and the governor to enter into contracts for repairing rooms used by the legislature and its committees without the treasurer's approval. He further argued that as a matter of law the legislation on its face violated the separation of powers provision contained in Article 2, § 1 because it empowered the legislature to exercise powers properly belonging to the treasurer as a member of the executive branch. Gordon also filed a motion for certification of the issues raised in his partial summary judgment to this Court, contending that it was in the best interest of the public, the Court, and the parties for the matter to be resolved as expeditiously as possible, and that certifying the case would hasten its resolution.
[¶9] In response to Gordon's partial summary judgment motion, the State argued that it should be denied[8] because Gordon had not established that the requirements of Article 3, § 31 applied to the capitol restoration project; Gordon had not established that the capitol restoration project legislation facially violated Article 3, § 31 ; and the legislation did not violate the separation of powers provision found in Article 2, § 1. With regard to Gordon's motion to certify, the State contended it should be denied because he had not established that certifying the questions of law "may be determinative" of the case nor had he established a lack of controlling precedent as required by W.R.A.P. 11.01. The district court heard arguments on the motions in December of 2016.
[¶10] In early 2017, while the motions were pending in district court, the legislature amended the capitol restoration legislation in pertinent part as follows:[9]
§ 9-5-111. State capitol building rehabilitation and restoration project oversight group; creation; duties.
(a) There is created a state capitol building rehabilitation and restoration oversight group comprised of:
* * *
(v) The state treasurer;
* * *
(b) A quorum of the oversight group shall consist of the governor and a majority of the other voting members of the oversight group which consist of the legislator members and the state treasurer....
* * *
Wyo. Stat. Ann. § 9-5-111 (LexisNexis 2017) (emphasis added); see also 2017 Wyo. Sess. Laws ch. 204, § 1.
*1099 § 9-5-112. Capitol building rehabilitation and restoration project; components; oversight.
* * *
(f) ... Any change order to the approved final design plans in excess of ... shall require the approval of the governor and a majority of the other voting members of the oversight group which consist of the legislator members and the state treasurer.
Wyo. Stat. Ann. § 9-5-112 (LexisNexis 2017) (emphasis added); see also 2017 Wyo. Sess. Laws ch. 204, § 1.
[¶11] In May of 2017, the district court issued a decision letter in which it denied Gordon's motion for partial summary judgment and request for certification, and entered summary judgment for the State. The district court held that Gordon failed to establish that the capitol restoration legislation violated the constitution on its face or that the work being done on the project was the type of repair work contemplated by the framers when they adopted Article 3, § 31. The district court entered an order consistent with its decision letter. Gordon appealed.
STANDARD OF REVIEW
[¶12] As a relatively recent case holds:
Issues of constitutionality present questions of law. Cathcart v. Meyer , 2004 WY 49, ¶ 7, 88 P.3d 1050, 1056 (Wyo. 2004). In determining the constitutionality of a statute, we have previously stated that:
The party challenging the constitutionality of a statute bears the burden of proving the statute is unconstitutional. Pfeil v. Amax Coal West, Inc. , 908 P.2d 956, 961 (Wyo. 1995). That burden is a heavy one "in that the appellant must 'clearly and exactly show the unconstitutionality beyond any reasonable doubt.' " Cathcart v. Meyer , 2004 WY 49, ¶ 7, 88 P.3d 1050, 1056 (Wyo. 2004), quoting Reiter v. State , 2001 WY 116, ¶ 7, 36 P.3d 586, 589 (Wyo. 2001). In our analysis, we presume "the statute to be constitutional.... Any doubt in the matter must be resolved in favor of the statute's constitutionality." Thomson v. Wyoming In-Stream Flow Committee , 651 P.2d 778, 789-90 (Wyo. 1982).
Krenning v. Heart Mt. Irrigation Dist ., 2009 WY 11, ¶ 33, 200 P.3d 774, 784 (Wyo. 2009). However, we have also recognized that "[t]hough the supreme court has the duty to give great deference to legislative pronouncements and to uphold constitutionality when possible, it is the court's equally imperative duty to declare a legislative enactment invalid if it transgresses the state constitution." Washakie County Sch. Dist. v. Herschler , 606 P.2d 310, 319 (Wyo. 1980). In this case, Appellants present a facial challenge, which is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." Director of the Office of State Lands & Invs. v. Merbanco, Inc ., 2003 WY 73, ¶ 32, 70 P.3d 241, 252 (Wyo. 2003).
Powers v. State , 2014 WY 15, ¶ 7, 318 P.3d 300, 303 (Wyo. 2014) (footnote omitted). In accordance with the standard of review, we take seriously the magnitude of the challenge Gordon faces.[10]
DISCUSSION
1. Constitutionality of the Capitol Restoration Legislation in light of Article 3, § 31
[¶13] The focus of Gordon's first argument on appeal was that the capitol restoration *1100 legislation violates Article 3, § 31 of the Wyoming Constitution because it strips the treasurer of his or her fundamental authority to approve contracts for the repair and furnishing of the halls and rooms used for meetings of the legislature and its committees. The State urges this Court not to consider this issue, arguing that Gordon has not shown that the capitol restoration legislation conflicts with the contract approval clause found in Article 3, § 31, a showing the State asserts he must make to succeed on his facial challenge. It argues that if we decide the case on this basis, there would be no need to decide whether the capitol restoration project involves "repairing and furnishing the halls and rooms used for the meeting of the legislature and its committees" as those words were used by the framers. The State is correct that a ruling that the capitol restoration legislation does not conflict with Article 3, § 31 would be dispositive. Therefore, we begin our discussion with that issue.
a. Conflict between the capitol restoration legislation and Article 3, § 31
[¶14] The State asserts that the capitol restoration legislation is silent as to who is, or is not, authorized to approve contracts for the project. Given that silence, the State argues, the legislation does not prohibit the treasurer from approving those contracts. Because the treasurer's approval is not prohibited, the State contends, the legislation is not in conflict with Article 3, § 31 and is not unconstitutional on its face. Citing Pisano v. Shillinger , 835 P.2d 1136, 1140 (Wyo. 1992), the State asserts statutory silence as to the treasurer's constitutional contract approval authority is insufficient to show that the legislature intended to prohibit his approval.
[¶15] The State's contention that the legislation is silent as to who is authorized to approve contracts for the project is not quite true. The plain language of the capitol restoration legislation indicates that the legislature intended the project to move forward without treasurer approval of contracts relating to the project. Section 9-5-112(b) provides for approval of design alternatives by the oversight group and the governor; § 9-5-112(e) allows the expenditure of funds on the project upon approval of plans by a majority of the oversight group and the governor; § 9-5-112(f) authorizes the state construction department to expend funds to implement the restoration project and allows change orders upon approval of a majority of the legislative members of the oversight group and the governor; § 9-5-113(a)(i) mandates that the state construction department is the primary fiscal and contracting agent for the project; and § 9-5-113(a)(ii) places the design and construction of the project under the direction and control of the governor. These provisions as written allow the project to be designed, implemented, constructed and paid for by persons and/or entities other than the state treasurer. They allow the project to proceed in all respects without the treasurer's approval. The legislation is not, therefore, silent as to the treasurer's contract approval as the State asserts.
[¶16] Additionally, the issue in Pisano was whether, in enacting Wyo. Stat. Ann. § 7-13-402(f), the legislature intended to prohibit judicial review under the Wyoming Administrative Procedure Act (WAPA) of parole board decisions. Pisano , 835 P.2d at 1138. Section 7-13-402(f) provided that "[t]he promulgation of substantive rules by the board [of parole] and the conduct of its hearings are specifically exempt from all provisions of the [WAPA]." Pisano , 835 P.2d at 1138. Although Pisano asserted the provision violated his constitutional right to due process, the Court did not address that issue because it determined that the legislature did not intend § 7-13-402(f) to preclude judicial review of parole revocation hearings. Id. at 1139-40.
[¶17] In reaching that conclusion, the Court relied on well-established policy favoring judicial review in most instances. Id. at 1138-39. Consistent with that policy, the Court said, is the concept that "the right to review is not precluded unless legislative intent to preclude judicial review is clear and convincing." Id. at 1139. "[W]here substantial doubt about legislative intent exists, the general presumption favoring judicial review of administrative action is controlling." Id. (citing Block v. Community Nutrition Institute , 467 U.S. 340, 351, 104 S.Ct. 2450, 2456, 81 L.Ed.2d 270 (1984) ).
*1101 [¶18] Turning to § 7-13-402(f), the Court looked at the plain language and concluded there was a distinction between judicial review of the board's hearing procedures and judicial review of the board's ultimate decision. Pisano , 835 P.2d at 1139. The Court said:
[T]he Board's right to adopt its own procedures simply means that, barring any constitutional limitations, a parolee cannot seek judicial review of the Board's decision upon grounds relating to the conduct of the Board's hearings. However, the fact that the conduct of the hearing is not subject to review does not mean that the decision itself is not subject to review. The conduct of a hearing merely provides the procedural process through which a decision is reached. The Board's final decision is still reviewable by the district court pursuant to § 16-3-114(c), which requires, among other things, that the Board's findings be supported by substantial evidence and that its action not be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Accordingly, we hold that the exemption of the Board's hearing procedures from the WAPA does not evidence an intent to preclude judicial review of the Board's revocation decisions.
Id. at 1139-40 (emphasis added).
[¶19] The Court then went on to consider "the significance, if any, of the legislature's silence regarding judicial review in § 7-13-402(f)." Id. at 1140. The Court cited United States Steel Corporation v. Wyoming Environmental Quality Council , 575 P.2d 749, 750 (Wyo. 1978), for the principle that "legislative intent to restrict judicial review must be specifically manifested and that a persuasive reason must exist to believe that restriction was the legislature's purpose." Pisano , 835 P.2d at 1140. The Court said:
It naturally follows that, if we require clear evidence of legislative intent to restrict review, "the mere failure to provide specially by statute for judicial review is certainly no evidence of intent to withhold review." Keslar [v. Police Civil Service Comm'n, City of Rock Springs ], 665 P.2d [937,] 942 [ (Wyo. 1983) ] (quoting Association of Data Processing Service Organizations, Inc. v. Camp , 397 U.S. 150, 157, 90 S.Ct. 827, 831, 25 L.Ed.2d 184 (1970) ). Statutory silence regarding judicial review constitutes neither a persuasive reason nor a manifestation of legislative intent to prohibit review. Consequently, we do not interpret § 7-13-402(f)'s silence on judicial review as being an indication of legislative intent to preclude review.
Pisano , 835 P.2d at 1140.
[¶20] The Court's comments in Pisano concerning legislative silence were made in the context of legislation that, if read to prohibit judicial review, would not promote the policy favoring judicial review. We are not aware of any cases, and the State cites none, extending the principles espoused there beyond the scope of legislation that arguably prohibits judicial review. Obviously, the legislation in this case does not involve judicial review or the policy favoring it.
[¶21] Additionally, in Pisano the Court concluded that the plain language of § 7-13-402(f) showed that the legislature intended to preclude judicial review of the conduct of parole board hearings, not of parole board decisions themselves. Pisano , 835 P.2d at 1139. In that context, the Court held that the exemption of the Board's hearing procedures from the statute did not evidence an intent to preclude judicial review of parole board decisions. In contrast, the plain language of the capitol restoration legislation expresses that the legislature intended the project to move forward without treasurer approval of contracts relating to the project. As we said in ¶15 above, §§ 9-5-112(b), (e) and (f) and 9-5-113(a)(i) and (ii) established a comprehensive scheme to design, implement, construct and pay for the project without state treasurer approval of any part of it. We conclude the exemption of the treasurer's contract approval authority from the capitol restoration legislation evidences an intent to preclude it.
[¶22] The State attempted to draw a distinction between the authority vested in these provisions and the contract approval authority granted in Article 3, § 31. According to this argument, the authority to approve the design and plans referenced in § 9-5-112(b) and (e), respectively, are different than the authority to approve contracts, as *1102 are the authority to expend funds ( § 9-5-112(f) ) and control the design and construction of the project ( § 9-5-113(a)(ii) ). Similarly, designating the state construction department as the primary contracting agent is distinct from the treasurer's contract approval authority. Under the State's theory, the authority the legislature gave to others in the capitol restoration statutes does not take away from the treasurer's contract approval authority.
[¶23] The State's argument defies common sense. Rather than preserving the treasurer's constitutional authority, the legislature has effectively given it away by assigning authority and control over the capitol restoration project to others. Unlike the Court's conclusion in Pisano , we conclude the statutory silence as to the treasurer's responsibility for approving capitol restoration contracts, together with the express statutory authorization given to others to effectuate the project, evidences an intent by the legislature to exclude the treasurer from exercising his constitutional duty.
[¶24] In addition, if there were any doubt as to the legislature's intent under the original capitol improvements legislation, the 2017 amendments removed it. As noted above, the amendment made the state treasurer a member of the capitol restoration committee. Wyo. Stat. Ann. § 9-5-111(a)(v) (LexisNexis 2017); 2017 Wyo. Sess. Laws ch. 204, § 1. However, the legislation required the approval of the governor and the majority of other voting members of the oversight group, including the treasurer. As discussed below, the clear impact of the amendment was to allow the treasurer a vote, but to deprive him of the right to approve repairs and furnishings to the halls and rooms of the legislature. We have held that a statute
that enumerates the subjects or things on which it is to operate, or the persons affected, or forbids certain things ... as excluding from its effect all those not expressly mentioned." Cathcart v. Meyer , 2004 WY 49, ¶ 40, 88 P.3d 1050, 1066 (Wyo. 2004) (citing In re West Highway Sanitary & Imp. Dist ., 77 Wyo. 384, 317 P.2d 495, 504 (1957) ). See also The Adeline , 13 U.S. (9 Cranch) 244, 253, 3 L.Ed. 719 (1815) ("Now the construction must depend on the evident meaning and intent of the legislature, as clearly to be gathered from a view of the whole provision; and it may be adopted as a fundamental rule, that where there is an express provision, there shall not be a provision by implication; expressio unius est exclusio alterius .").
Walters v. State ex rel. Wyoming Dep't of Transp ., 2013 WY 59, ¶ 18, 300 P.3d 879, 884 (Wyo. 2013). The statute as it now exists does not provide for the approval required by Article 3, § 31.
[¶25] Citing Circuit Court of the Eighth Judicial District v. Lee Newspapers , 2014 WY 101, ¶ 27, 332 P.3d 523, 532 (Wyo. 2014), and Merrill v. Jansma , 2004 WY 26, ¶ 40, 86 P.3d 270, 287 (Wyo. 2004), respectively, the State asserts this Court must presume the legislature did not intend to enact legislation that violates the constitution and that it enacted the capitol restoration legislation with full knowledge of existing law. Given these presumptions, the State contends, it is reasonable to infer that the legislature did not address the treasurer's constitutional role in the capitol restoration project because Article 3, § 31 independently governs the contracts subject to the treasurer's approval, and any statutory language would be superfluous.
[¶26] To recap and reiterate, the capitol restoration legislation assigns the responsibility to approve, control and pay for the project to groups and persons other than the treasurer. The legislation also assigns the primary responsibility for contracting for work done on the project to the state construction department, not the treasurer. The State's argument that the legislature's use of the word "primary" somehow leaves open the question of who is to approve the contracts is, in light of the entire legislative scheme, nonsensical.[11] The legislature has made others responsible for the project from beginning to end and, in doing so, has taken away *1103 the treasurer's constitutional authority to approve contracts for parts of the capitol restoration project involving the legislature. This is contrary to the rule that the legislature may not abolish or transfer, either directly or indirectly, inherent powers of a constitutionally created office. Powers , ¶ 22, 318 P.3d at 308. See also Witzenburger v. State ex rel. Wyo. Cmty. Dev. Auth. , 575 P.2d 1100, 1117 (Wyo. 1978) ("The legislature cannot do indirectly what it cannot do directly.").
[¶27] Now that we have reached this conclusion, we must consider whether the statute for the capitol restoration project necessarily includes work which must be approved by the treasurer under Article 3, § 31. And then, if it does, we must decide if the offending provisions are severable so that the remainder of the capitol restoration statutes may be salvaged.
b. Breadth of Article 3, § 31
[¶28] Gordon asserts that the plain meaning of Article 3, § 31 requires the treasurer to approve contracts for the repair and furnishing of the halls and rooms used by the legislature and its committees. He argues that the capitol restoration legislation violates the constitution because it authorizes the oversight group and others to approve expenditures for the capitol restoration project without requiring the treasurer's approval of the contracts leading to those expenditures.
[¶29] The State argues that the language used in Article 3, § 31 is not broad enough to include the comprehensive renovation and restoration of the state capitol and Herschler buildings currently underway. The State contends the words "repairing and furnishing the halls and rooms used for the meeting of the legislature and its committees" must be read to mean "routine" repairs and furnishings. The State argues that limiting the words in that way makes sense in light of the other items referenced in the provision, such as stationary, fuel and lights, which are purchased on a routine basis.
[¶30] In cases requiring constitutional interpretation, we are guided primarily by the intent of the drafters. Saunders v. Hornecker , 2015 WY 34, ¶ 19, 344 P.3d 771, 777 (Wyo. 2015) (quoting Powers , ¶¶ 8-9, 318 P.3d at 303-04 ). In determining that intent, we look first to the plain and unambiguous language used in the text of the constitution. Id. If the language is plain and unambiguous, there is no room left for construction. Id .
It must be presumed that in case of a constitution the people have intended whatever has been plainly expressed. Courts are not at liberty to depart from that meaning which is plainly declared.
Id .
[¶31] As reflected in ¶6 above, Article 3, § 31 requires in pertinent part that all contracts for "repairing and furnishing the halls and rooms used for the meeting of the legislature and its committees ... shall be subject to the approval of the ... state treasurer." (Emphasis added.) To determine what the drafters intended, we attempt to understand the meaning of the words at the time the constitution was ratified. Powers , ¶ 36, 318 P.3d at 313 (citing Campbell Cty. Sch. Dist. v. State , 907 P.2d 1238, 1258 (Wyo. 1995) ; Witzenburger , 575 P.2d at 1111 ). At the time our constitution was ratified, the word "hall" in the context in which it was used in Article 3, § 31 was defined as: "1. A building , or a large room or compartment in a building , devoted to some public or common use[.]" The Century Dictionary 2690 (1889) (emphasis added). The word "room" was defined as: "5. Any inclosure or division separated by partitions from other parts of a ... structure; ... chamber ...[.]" Id . at 5223. Giving the words "halls" and "rooms" the meaning they had at the time our constitution was ratified, it seems clear that the drafters intended Article 3, § 31 to apply to buildings, compartments in buildings, or enclosures separated by divisions from other parts of a building that were used for the meetings of the legislature and its committees.
[¶32] At the time the constitution was ratified, the word "repair" was defined as: "To restore to a sound, good, or complete state after decay, injury, dilapidation, or partial destruction; restore ; renovate ." Id . at 5080 (emphasis added). The word "furnishing" meant: "The act of providing with furniture *1104 or fittings of any kind." Id . at 2416. Giving the word "repair" the meaning it had at the time our constitution was ratified, it would appear the drafters intended Article 3, § 31 to apply to repairs and renovations necessary to restore to a sound state after decay or dilapidation buildings or compartments in buildings used for meetings of the legislature and its committees.
[¶33] At the time the constitution was ratified, "approve," in the context in which it was used in Article 3, § 31, meant: "[t]o sanction officially; ratify authoritatively." Id . at 279. The word "sanction" was defined as: "the act of rendering authoritative as law; ...; the act of ... ratifying [.]" Id . at 5327. The word "ratify" meant: "1. To confirm; establish; settle conclusively or authoritatively; .... 2. To validate by some formal act of approval; accept and sanction[.]" Id. at 4970. Applying the meaning of the words plainly expressed at the time the constitution was ratified, it would seem that the drafters intended to require the state treasurer's approval of all contracts for restoring or renovating, and furnishing, the buildings or parts of buildings used for meetings of the legislature and its committees.
[¶34] There is no dispute that repairing and furnishing the buildings or parts of buildings used for meetings of the legislature and its committees is part of the capitol restoration project. Section 9-5-110(iv) defines the "project" as "the state capitol building and Herschler state office rehabilitation, restoration and renovation project described in W.S. 9-5-112, including all components of the project." Section 9-5-112(a) directs the state construction department to "proceed with level III design and construction for renovation, rehabilitation, restoration and addition to the state capitol and Herschler buildings." Section 9-5-112(a)(i), (ii) and (v) provide respectively that restoration and rehabilitation of the capitol and Herschler buildings and furnishings are components of the project. Section 9-5-112(b) expressly provides that the level III design shall allocate space within the capitol building "to meet legislative needs" unless the governor and oversight committee determine that all such needs cannot be accommodated within the capitol building.
[¶35] Given that the statutes directly address "repairing and furnishing the halls and rooms used for the meeting of the legislature" as the underlined words were defined at the time the constitution was ratified, any contracts for those repairs and furnishings were subject to the approval of the state treasurer pursuant to Article 3, § 31. Contrary to that provision, however, the capitol restoration statutes give others the responsibility for effectuating the project, including repairing and furnishing the halls and rooms used for meetings of the legislature.
[¶36] Borrowing language from Powers , ¶ 66, 318 P.3d at 322, "[u]nder any good faith and common sense reading" of the capitol restoration legislation, it appears that the treasurer's responsibility to approve contracts for the restoration of and furnishings for the legislative halls and committee rooms has been entrusted to the state construction department, oversight group, and the governor. The legislation, therefore, violates Article 3, § 31 of the constitution and is unconstitutional on its face.
[¶37] In challenging this interpretation, the State asserts that the drafters intended to limit the contract approval clause to routine repair and furnishing of the legislative halls and rooms. The State cites three rules of constitutional interpretation in support of its assertion. First, the State references the rule that constitutional provisions limiting legislative power are to be strictly interpreted. The State contends that Article 3, § 31 limits legislative power; therefore, it must be strictly interpreted.
[¶38] The text of our state constitution suggests "that the delegates were determined to limit legislative power and to protect against corruption." Robert B. Keiter, The Wyoming State Constitution 11 (2nd ed. 2017). "Article 2 of the constitution explicitly recognizes the principle of separation of powers by dividing state government into separate legislative, executive, and judicial departments" and there are thirty-seven separate instances where the framers sought to protect against corruption or constrain legislative power by prohibiting the legislature *1105 from certain actions. Id . Additionally, in contrast to the fifty sections in Article 3 defining the legislature's power, Article 4, which addresses executive power, consists of only fifteen sections. Id .
[¶39] In light of the general tenor of our state constitution, it seems evident that the framers did intend to constrain legislative power. One example of this intent appears in Article 3, § 31's requirement that the state treasurer approve contracts for repairing and furnishing legislative areas, thereby providing a check on the legislature's efforts to provide for itself. That the framers sought to constrain legislative power does not mean, however, that Article 3, § 31 can reasonably be read to mean "routine" repairs. This interpretation would require inserting the word "routine" into the text of Article 3, § 31. We will not read words into the provision that the drafters omitted. See City of Casper v. Holloway , 2015 WY 93, ¶ 20, 354 P.3d 65, 71 (Wyo. 2015) ("A basic tenet of statutory construction is that omission of words from a statute is considered to be an intentional act by the legislature, and this court will not read words into a statute when the legislature has chosen not to include them."); Cantrell v. Sweetwater Cty. Sch. Dist. No. 2 , 2006 WY 57, ¶ 6, 133 P.3d 983, 985 (Wyo. 2006) ("In construing constitutional provisions, we follow the same rules that govern the construction of statutes.").
[¶40] In support of its argument that the provision should be interpreted to mean "routine" repairs, the State cites In re Estate of Durrin's , 61 Wyo. 1, 154 P.2d 348 (1944), and Brown v. Clark , 47 Wyo. 216, 34 P.2d 17 (1934). Durrin's involved the question of whether a statute authorizing courts to order a guardian to invest a ward's money "in any other manner most to the interest of all concerned" violated Article 3, § 38 of the Wyoming Constitution. Durrin's , 154 P.2d at 353. At that time, Article 3, § 38 provided that "[n]o act of the legislature shall authorize the investment of trust funds by executors, administrators, guardians or trustees, in the bonds or stock of any private corporation."[12] Reading the constitutional provision in pari materia with Article 5, § 10, which grants the district courts plenary power in all cases of law and equity, including probate matters, the Court said that Article 3, § 38 must be interpreted strictly so as not to impede the broad powers granted to the courts elsewhere in the constitution. Id . at 354-55.
[¶41] Durrin's , therefore, involved the interpretation of two constitutional provisions, one restricting legislative power and another granting judicial power. It was in that context that the Court said provisions restricting legislative power are to be strictly construed. Because the provision granting judicial power gave the district courts broad authority in all cases, and the statute at issue gave effect to judicial authority in the context of trust funds, the Court concluded the statute was not unconstitutional.
[¶42] In Brown , the Court considered the constitutionality of legislation abolishing two of the nine Wyoming judicial districts existing at the time and transferring certain counties to other judicial districts. The legislation was challenged as a violation of Article 5, § 21, which gave the legislature the authority to increase the number of districts and judges, but said nothing about decreasing the number. Those challenging the statute argued that by giving the legislature the power to increase the number of judicial districts and judges in Article 5, § 21, the framers by implication intended to prohibit the legislature from decreasing the number.
[¶43] In that context, the Court cited the principle that constitutional restrictions on legislative power are not to be enlarged by construction beyond their terms. Brown , 34 P.2d at 18-19. However, the Court upheld the statute, finding that two other constitutional provisions gave the legislature clear authority not only to increase the number of districts, but to decrease the number established by preceding legislatures. The Court referenced Article 5, § 19, which provided that "[u]ntil otherwise provided by law," the state was to be divided into three judicial *1106 districts each with one district judge, and Article 5, § 20, which specified what counties were within each district "[u]ntil otherwise provided by law." Read in pari materia with these provisions, which clearly authorized legislative action, the Court concluded that Article 5, § 21 could not be interpreted to mean that the framers intended to prohibit the legislature from decreasing the number of judicial districts or judges.[13] Brown , 34 P.2d at 20-21.
[¶44] In both Durrin's and Brown , the Court looked to relevant constitutional provisions, and based upon those provisions, found the challenged legislation constitutional. In reaching that result, the Court interpreted constitutional provisions expressly or arguably limiting legislative power so as not to interfere with the other constitutional provisions expressly granting broad powers, to the judiciary in Durrin's and to the legislature in Brown . The principles the Court relied on in those cases are not applicable here, where only one constitutional provision which expressly grants power to the state treasurer is at issue. This is not a case of interpreting one constitutional provision expressly, or arguably limiting legislative power in light of other constitutional provisions granting broad powers to the legislature or another branch of government. Article 3, § 31 grants the treasurer the power to approve contracts for repairing and furnishing the legislative halls and rooms, and we will not interpret it otherwise.
[¶45] The State next cites Ross v. Trustees of University of Wyoming , 31 Wyo. 464, 228 P. 642, 646 (1924), for the principle that provisions in the Wyoming Constitution should be given a common sense and practical interpretation. According to the State, Article 3, § 31 must be interpreted to mean "routine" repairs, not the complete renovation of the capitol and Herschler buildings that is the subject of the legislation at issue. As we concluded in ¶¶31-33 above, when the words plainly expressed in Article 3, § 31 are given the meaning they had at the time our constitution was ratified, it is clear the drafters intended to require the state treasurer's approval of all contracts for restoring or renovating and furnishing the buildings or parts of buildings used for meetings of the legislature and its committees. Consistent with the principle espoused in Ross , this is a common sense and practical interpretation of Article 3, § 31. The State's efforts to restrict the meaning of the words "repairing" and "furnishing" to "routine" repairs and furnishing ignores the plain meaning of the words expressed at the time the drafters ratified the constitution. It also requires inserting a word into the provision that the drafter omitted, which we are not at liberty to do. Holloway , ¶ 20, 354 P.3d at 71.
[¶46] The State next argues that applying the doctrine of noscitur a sociis , the repairing and furnishing clause of Article 3, § 31 must be interpreted in light of the earlier clauses in the provision. Pointing to the introductory clauses, which refer to "stationery, printing, paper, fuel and lights," and "printing and binding of the laws, journals and department reports," the State argues that these items are goods and services purchased on a routine basis and, therefore, the repairing and furnishing clause should be interpreted to mean routine repairs and furnishings. As we have said, the word "routine"
*1107 does not appear in Article 3, § 31, and we will not read the word into the provision.
[¶47] Additionally, there are three separate clauses in the first sentence of Article 3, § 31. The first clause refers to items used in the legislature "and other departments;" the second refers to printing and binding of laws, journals and "department" reports; and the third refers to halls and rooms used by the legislature and its committees. The third clause does not reference "other departments." It is, therefore, distinct from the two prior clauses because it applies only to the legislature and its committees.
[¶48] Finally, the doctrine of "noscitur a sociis counsels 'that general and specific words are associated with and take color from each other, restricting general words to a sense analogous to the less general.' " Yager v. State , 2015 WY 139, ¶ 23, 362 P.3d 777, 784 (Wyo. 2015) (quoting Sponsel v. Park Cty. , 2006 WY 6, ¶ 16, 126 P.3d 105, 110 (Wyo. 2006) ) (citing Black's Law Dictionary 1087 (8th ed. 2004) ). The doctrine is applied only to discover the meaning of ambiguous terms. Id . (citing United States v. Stevens , 559 U.S. 460, 474, 130 S.Ct. 1577, 1588, 176 L.Ed.2d 435 (2010) ("As that canon recognizes, an ambiguous term may be given more precise content by the neighboring words with which it is associated.") ). We have concluded that Article 3, § 31 is not ambiguous. Therefore, we will not apply the doctrine of noscitur a sociis .
[¶49] The State argues at some length that the capitol restoration legislation, and the contracts arising from it, cannot reasonably be interpreted as falling within what it characterizes as the narrow purview of Article 3, § 31. This is simply another attempt to limit the meaning of the word "repair" to mean "routine" repairs and to exclude the large-scale capitol restoration project currently underway. The argument ignores the meaning of the words "repair," "furnishing," "halls," and "rooms" at the time the drafters used them. Applying the meaning of the words at the time the constitution was ratified, it is clear the drafters intended the state treasurer to approve all contracts for the restoration, renovation, and furnishings of buildings, or enclosures within buildings, used for meetings of the legislature and its committees. The current capitol restoration project involves renovation and furnishing of buildings and portions of buildings used by the legislature and its committees, and therefore, the treasurer's approval of at least some of the work contemplated by the statute was required.
[¶50] The State contends that interpreting the capitol restoration legislation as allowing the project to go forward without the treasurer's approval runs afoul of the principle that this Court should never interpret a statute as unconstitutional when it can, in any possible way, be reconciled with the constitution, citing Hanson v. Town of Greybull , 63 Wyo. 467, 183 P.2d 393, 401 (1947). The State also references the principle that we will not presume the legislature intended to enact a law in violation of the constitution. Id . at 397. In Hanson , the challenged legislation authorized cities and towns to borrow money and issue bonds for airport purposes "in any amount not exceeding at any one time, four per cent" of the assessed value of the city or town. Id . at 394. The challengers asserted that the statute violated Article 16, § 5 of the state constitution, which prohibited cities and towns from creating indebtedness exceeding two percent of the assessed value of the taxable property in the city or town. Applying the principles of statutory interpretation referenced above, the Court concluded:
It is, we think, clear that ... the legislature ... intended to authorize cities or towns to increase their bonded indebtedness beyond the limitation of 1 per centum of the assessed valuation of such city or town as permitted by [statute]. Through some oversight, the lawmaking body fixed that increase at a figure which runs counter to the mandatory requirements of [ Article 16, § 5 ] of the Wyoming Constitution. Reading the controlling constitutional limitation clause in conjunction with the ... statute, and under the authorities above reviewed, but one conclusion would appear possible, viz., that [the challenged statute] ... authorized the bonded indebtedness for airport purposes only to the extent of two (2%) per centum of the town's assessed valuation.
*1108 Id. at 401-02. Thus, in Hanson , the Court reconciled the statute with the constitution by bringing the statute into conformity with the constitution. The Court in Hanson did not add words to the constitutional provision so as to validate the statute as the State asks us to do here.
[¶51] More importantly, while the Court "has the duty to give great deference to legislative pronouncements and to uphold constitutionality when possible, it is the court's equally imperative duty to declare a legislative enactment invalid if its transgresses the state constitution." Powers , ¶ 7, 318 P.3d at 303 ; see also Witzenburger , 575 P.2d at 1114. Article 3, § 31 requires the treasurer's approval of contracts such as some of those involved in the capitol restoration project. The capitol restoration legislation entrusts that responsibility to others. The legislation, therefore, facially transgresses the constitution, and it is our duty to declare it invalid.
[¶52] In their briefs and arguments to this Court, the parties spent considerable time addressing the attorney general's 2016 opinion, which concluded that Article 3, § 31 did not require the treasurer's approval of capitol restoration project contracts. Wyo. Atty. Gen. Op. 2016-001, 2016 WL 870371. This Court has said that "opinions of the attorney general are entitled to weight, particularly when those opinions have been weathered by the passage of time." Seyfang v. Bd. of Trustees of Washakie Cty. Sch. Dist. No. 1 , 563 P.2d 1376, 1382 (Wyo. 1977) (citing Sch. Dists. Nos. 2, 3, 6, 9 and 10, Campbell Cty. v. Cook , 424 P.2d 751, 756 (Wyo. 1967) ). This Court has also said that attorney general opinions are worthy of careful consideration when, in response, the legislature does not act to change a statute over a long period of time. Id . These principles have little application here when the 2016 attorney general opinion has not weathered the passage of time and, within a year of its issuance, the legislature amended the statutes to include a role for the treasurer. More importantly, when this Court finds cogent reasons for disagreement with an attorney general opinion, we are duty bound to say so. Id . For the reasons set forth in the foregoing paragraphs of this opinion, we disagree with the attorney general's 2016 opinion.[14]
[¶53] We are not alone in concluding that plain language such as that used in Article 3, § 31 of our state constitution requires the state treasurer's approval. In State ex rel. State Publishing Co. v. Hogan , 22 Mont. 384, 56 P. 818 (1899), a publishing company claimed that it had entered into a contract with the state board of examiners to publish state laws and resolutions. When the secretary of state declined to deliver the items for publication, the publisher sought an order requiring him to deliver them. Citing Article 5, § 30 of the Montana Constitution, a provision containing language nearly identical to that found in Article 3, § 31 of the Wyoming Constitution, the Montana Supreme Court held:
It being indispensable that the agreement of the board shall be approved by the governor and treasurer, before there can be a valid contract, mere allegations that the board of examiners received bids, and made a contract with [the publisher] ... are wholly insufficient[.] The approval of the governor and treasurer is by way of a check upon possible extravagancies of the board of examiners. Call it a power like the veto power of a governor ... or one of annihilation ... ; it nevertheless exists as a portion of the constitution, in clear and unambiguous language,-so plain that but the one construction can possibly obtain.
Id . at 820. Like the approval required in Hogan , the treasurer's approval of contracts for repairing and furnishing areas used by the legislature operates as a check on legislative power, exists by virtue of the constitution, and can only be interpreted to mean that the treasurer's approval is required.
*1109 2. Constitutionality of Capitol Restoration Legislation on its Face in light of Article 2, § 1
[¶54] Gordon also asserted the capitol restoration legislation violated the separation of powers provision of the Wyoming Constitution, which provides:
§ 1. Powers of government divided into three departments.
The powers of the government of this state are divided into three distinct departments: The legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted.
Wyo. Const. Art. 2, § 1.
[¶55] "Declaring the validity of statutes in relation to the constitution is a power vested in the courts as one of the checks and balances contemplated by the division of government into three departments [,] legislative, executive and judicial." Washakie Cty. Sch. Dist. No. One v. Herschler , 606 P.2d 310, 318 (Wyo. 1980) (citing Article 2, § 1 of the Wyoming Constitution and Marbury v. Madison, (1803), 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 ). The judiciary will not encroach into the legislative field of policy making; however, as the final authority on constitutional questions, the judiciary has the constitutional duty to declare unconstitutional that which transgresses the state constitution. State v. Campbell Cty. Sch. Dist ., 2001 WY 19, ¶ 55, 19 P.3d 518, 540 (Wyo. 2001) (citing Rose v. Council for Better Educ. Inc ., 790 S.W.2d 186, 209 (Ky. 1989) ("The judiciary has the ultimate power, and the duty, to apply, interpret, define, construe all words, phrases, sentences and sections of the .... constitution .... It is solely the function of the judiciary to do so ..., even when such action serves as a check on the activities of another branch of government.") ). Laws may be enacted that do not interfere with the constitutional or inherent authority of the executive branch; however, statutes that interfere with that authority are unconstitutional. Powers , ¶ 20, 318 P.3d at 307.
[¶56] As we said in Powers , ¶ 57, 318 P.3d at 319-20, there is a difference between legislation assigning powers and duties to a member of the executive branch, and legislation removing powers and duties. As was the case with the superintendent of public instruction's power of general supervision of the public schools at issue in Powers , the treasurer's authority and responsibility to approve contracts for the repair and furnishing of areas used by the legislature and its committees is constitutional in origin. "Statutes consistent with that authority merely give effect to the Constitution." Id . If the treasurer's authority were only statutory, the legislature would be able to eliminate all powers and duties it assigned to the treasurer. Because the treasurer's authority to approve contracts for the repair and furnishing of legislative halls and rooms is not statutory, but a power entrusted to the office by Article 3, § 31, the legislature has no authority to transfer it to others. Id. There is simply no question "that the express grant of power to a constitutionally created office cannot be abrogated legislatively" unless the constitution expressly authorizes such action. Id. , ¶ 33, 318 P.3d at 313.
[¶57] Article 2, § 1 prohibits any person or collection of persons charged with exercising the powers belonging to one of the three branches from exercising powers properly belonging to another branch, except as the constitution expressly directs or permits. Article 3, § 31 expressly requires the treasurer's approval of contracts for repairing and furnishing areas used by the legislature. The capitol restoration legislation assigns all aspects of the project to the governor and other officials and groups created by the legislature. It, therefore, usurps the treasurer's authority under Article 3, § 31 and violates the separation of powers provision of the Wyoming Constitution.
3. Severability
[¶58] We must now address whether the provisions of the statute which eliminate the treasurer's approval are severable. At least one scholar argues that if an act has any constitutional applications, a court can construe *1110 them as a separate constitutional act. Michael C. Dorf, Facial Challenges to State and Federal Statutes , 46 Stan. L. Rev. 235, 250 (1994).
[¶59] In this case, we review a Wyoming statute and a provision of the Wyoming Constitution. The Wyoming legislature has directed us to attempt to salvage such portions of otherwise unconstitutional legislation it enacts as we can:
If any provision of any act enacted by the Wyoming legislature or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of any such act are severable[.]
Wyo. Stat. Ann. § 8-1-103(a)(vii) (LexisNexis 2017).[15]
[¶60] Fortunately, it is not difficult to conclude that the provisions of the statute affecting the treasurer's constitutional authority are severable. An overview of the project shows that it involves much more than the "halls and rooms of the legislature." To mention a few:
• There are major life safety issues at the capitol, including a lack of smoke alarms, smoke evacuation systems, and fire suppression systems. The building is not ADA compliant.
• The heating, ventilation, and air conditioning systems are outdated and need to be replaced, as is also true of the elevators, which will not accommodate a gurney to remove an unconscious or injured employee, visitor, or official. The entire capitol building electrical system is obsolete, hazardous and in need of replacement.
• There are insufficient and inadequate restrooms without adequate ADA accessibility.
• The office space for the executive branch officials is fragmented and separates those who need to interact frequently.
• There are exterior problems, including cracks in the rotunda, dents, tears and punctures in metal surfaces across the exterior of the dome, and water infiltration, which in turn has led to moisture damage.
• Because the executive and legislative branch have had to vacate the capitol and the Hershler building, alternative space for them has had to be purchased or rented.
• Meeting rooms will be used by the executive branch when the legislature is not in session or holding hearings in them.
[¶61] The breadth of the project means that our conclusion that the capitol restoration legislation violates Article 2, § 1 and Article 3, § 31 of the Wyoming Constitution does not mean that treasurer approval was or will be required for all work on the project. Because Article 3, § 31 is limited to contracts for repairing and furnishing only certain legislative areas, the treasurer's approval is not needed for restoring areas used by the governor or other elected officials.
[¶62] We remand the case so that the parties and the district court can wrestle with the appropriate scope of the treasurer's approval power. Although, as we have held, portions of the legislation are facially invalid in light of the treasurer's narrow constitutional check on the legislature's ability to spend on its own halls and rooms, there is still a role for fact-finding with regard to the scope of that narrow power in relation to the work contemplated by the legislation.
CONCLUSION
[¶63] We recognize the breathtaking magnitude of the capitol restoration project, and the incredible burden its necessity has placed on the legislature and the executive branch, as well as the people of this state. The legislation we review in this opinion appears to be an honest effort to render that Herculean endeavor possible. Requiring the treasurer's approval for certain aspects of the project adds a layer of complication which would in all likelihood be unheard of in private projects of similar magnitude. However, as the United States Supreme Court observed with *1111 regard to choices made by the Founders in the United States Constitution:
The choices we discern as having been made in the Constitutional Convention impose burdens on governmental processes that often seem clumsy, inefficient, even unworkable, but those hard choices were consciously made by men who had lived under a form of government that permitted arbitrary governmental acts to go unchecked. There is no support in the Constitution or decisions of this Court for the proposition that the cumbersomeness and delays often encountered in complying with explicit Constitutional standards may be avoided, either by the Congress or by the President. With all the obvious flaws of delay, untidiness, and potential for abuse, we have not yet found a better way to preserve freedom than by making the exercise of power subject to the carefully crafted restraints spelled out in the Constitution.
I.N.S. v. Chadha , 462 U.S. 919, 958, 103 S.Ct. 2764, 2788, 77 L.Ed.2d 317 (1983) (Burger, C.J.) (internal citations omitted).
[¶64] The lengths to which the framers of the Wyoming Constitution went to establish a check on the legislature's ability to spend money on its own facilities may seem extreme today, and perhaps many will think that kind of a limitation would be better entrusted to the electorate in its choice of representatives. However, that hard choice was made long ago by those empowered to do so, and we cannot ignore it.
[¶65] The capitol restoration legislation on its face violates Article 3, § 31 and Article 2, § 1 of the Wyoming Constitution because it impermissibly transfers the state treasurer's constitutional authority to approve contracts for "repairing and furnishing the halls and rooms used for the meeting of the legislature and its committees" to others. We reverse the district court's order and remand for further proceedings consistent with this decision.

Gordon also sued in his capacity as a Wyoming resident and qualified elector. The State has not challenged Gordon's standing. For a complete discussion of citizen standing and related issues, see Allred v. Bebout , 2018 WY 8, 409 P.3d 260 (Wyo. 2018).

Throughout the remainder of this decision, we refer to the project and legislation as the capitol restoration project or capitol restoration legislation. To the extent the decision also implicates areas in the Herschler building, they are encompassed within those descriptors.

Wyo. Stat. Ann. § 9-5-109(k) provided that the advisory task force was comprised of three members of the senate, three members of the house, five members, one each appointed by each of the five statewide elected officials, two members of the public with special expertise in the history of the capitol building, a staff member of the department of state parks and cultural resources, and a staff member from the department of administration and information, construction management program. See 2014 Wyo. Sess. Laws ch. 40, § 2. In 2016, the statute was amended to add a staff member from the "state construction department" instead of from the "department of administration and information, construction management program." See 2016 Wyo. Sess. Laws ch. 105, § 3.

This subsection was also amended in 2016 to substitute the "department of administration and information" with the "state construction department." See 2016 Wyo. Sess. Laws ch. 105, § 3.

Sections 9-5-101 through -108 created the state building commission and generally made it responsible for, among other things, construction projects involving state buildings. Section 9-5-108(a)(iii)(B) and (D) authorizes the state building commission to contract for construction, maintenance, etc. of state buildings.

Section 9-5-113(a)(i) of the capitol restoration legislation designated the Department of Administration & Information's construction management program within the general services division rather than the state building commission as the primary contracting agent for the capitol restoration project. In 2016, this statute was revised to designate the state construction department as the primary contracting agent for the capitol restoration project. See 2016 Wyo. Sess. Laws ch. 105, § 3. For the sake of simplicity, we will refer to the entity that has acted as the primary contracting agent for capitol restoration as "the state construction department."

In his complaint, Gordon named the oversight group as a defendant and listed the names of the elected officials serving on the committee at the time. Shortly thereafter, he filed an amended complaint naming the State of Wyoming, acting by and through the oversight group, as the defendant.

In his brief to this Court, Gordon stated that the State responded to his motion for partial summary judgment and "also filed their own counter-motion for summary judgment seeking dismissal" of his complaint. The State's brief correctly notes that the district court granted summary judgment for the State even though the State did not file a motion for summary judgment. A court may grant summary judgment to a nonmoving party if the record supports doing so. White v. Wheeler , 2017 WY 146, ¶ 14 n.2, 406 P.3d 1241, 1246 n.2 (Wyo. 2017) (citing Pennaco Energy, Inc. v. Sorenson , 2016 WY 34, ¶ 24 n.11, 371 P.3d 120, 125 n.11 (Wyo. 2016) ; Basic Energy Servs., L.P. v. Petroleum Res. Mgmt., Corp., 2015 WY 22, ¶ 20 n.11, 343 P.3d 783, 789 n.11 (Wyo. 2015) ; Boehm v. Cody Country Chamber of Commerce , 748 P.2d 704, 710 (Wyo. 1987) ; Leithead v. American Colloid Co. , 721 P.2d 1059, 1064 (Wyo. 1986) ). But see W.R.C.P. 56(f)(1), effective March 1, 2017 (a court may grant summary judgment to a nonmovant after giving notice and a reasonable time to respond).

The legislature amended other portions of the legislation in 2016 and 2017. Those amendments are not relevant to the issues before the Court.

We adhere to this standard under stare decisis despite the fact that the facial/as-applied distinction has been criticized as "an inherently flawed and fundamentally incoherent undertaking." Alex Kreit, Making Sense of Facial and As-Applied Challenges , 18 Wm. & Mary Bill Rts J. 657, 659 (2010). See also Michael C. Dorf, Facial Challenges to State and Federal Statutes, 46 Stan. L. Rev. 235, 239-41 (1994) (contending that courts regularly accept challenges that would fail the "no set of circumstances" test). We do so even though the United States Supreme Court has expressed reservations about the supposedly bright line between facial and as-applied analysis. Citizens United v. Fed. Election Comm'n , 558 U.S. 310, 331, 130 S.Ct. 876, 893, 175 L.Ed. 2d 753 (2010) ("[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge.").

It seems more likely that the word "primary" is intended to distinguish contracts involving the capitol restoration project from contracts involving other state buildings, for which § 9-5-108(a)(iii)(D) assigns responsibility to the state building commission. See n.5 supra .

Article 3, § 38 was amended in 1965 to allow the legislature to authorize the investment of trust funds by executors, administrators, guardians or trustees in the bonds or stocks of private corporations.

In Brown , 34 P.2d at 21, the Court also said:
This court has frequently been confronted with the necessity of limiting the operation of a statute to avoid a conflict with the Constitution. It is not at all uncommon for the court by construction so to limit a statute as to make it operative on only those persons, things, or situations to which it may apply without violating the superior law.
(Citations omitted.) However, the Court made those statements in the context of postponing the effective date of the statute by seven days rather than declaring it void. See also Salt Creek Transp. Co. v. Wyo. Public Serv. Comm'n , 37 Wyo. 488, 263 P. 621 (1928), in which the Court upheld a statute regulating transportation companies in the face of a constitutional challenge. Concluding that it was manifest that the legislature intended the statute to apply to common and not private carriers, the Court limited the operation of the statute to common carriers. Id. at 623. Unlike the provision at issue in Salt Creek , it is not manifest in the capitol restoration statutes that the legislature intended the treasurer to approve contracts for the capitol restoration project. To the contrary, the plain language of the legislation indicates that the legislature intended the oversight group, the governor, and the state construction department to make decisions necessary to effectuate the capitol restoration project.

Gordon argued that the 2016 attorney general's office opinion ignored a 1936 opinion in which the attorney general concluded that treasurer approval of contracts under Article 3, § 31 was mandatory and, absent the treasurer's approval, any such contract was invalid. Wyo. Atty. Gen. Op. (April 10, 1936). Although the 1936 opinion warrants consideration in the present case, it specifically addressed the first clause of Article 3, § 31 ; it did not address the meaning of the "repairing and furnishing" clause.

For purposes of this opinion, we take this legislation at face value and apply it.